*This opinion is subject to revision before final publication in the Pacific Reporter.*

**2015 UT 2**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

EDWARD JOSEPH STRIEFF, JR.,
*Petitioner.*

No. 20120854
Filed January 16, 2015

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Michele M. Christiansen
No. 071900011

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen.,
Salt Lake City, for respondent

Joan C. Watt, Robert K. Engar, Salt Lake City, for petitioner

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

JUSTICE LEE, opinion of the Court:

¶1 In this case we are asked to determine the applicability of the "attenuation" exception to the exclusionary rule to a fact pattern addressed in a broad range of lower-court opinions but not by the United States Supreme Court. The essential fact pattern involves an unlawful detention leading to the discovery of an arrest warrant followed by a search incident to arrest. The attenuation inquiry is essentially a proximate cause analysis. It asks whether the fruit of the search is tainted by the initial, unlawful detention, or whether the taint is dissipated by an intervening circumstance. As applied to the outstanding warrant scenario, the question pre-

sented is whether and how to apply the attenuation doctrine in this circumstance.

¶2   The lower courts are in disarray in their application of the attenuation doctrine to the outstanding warrant scenario. In some courts the discovery of an outstanding warrant is deemed a "compelling" or dispositive "intervening circumstance," purging the taint of an initially unlawful detention upon a showing that the detention was not a "purposeful" or "flagrant" violation of the Fourth Amendment.[1] In other courts, by contrast, the outstanding warrant is a matter of "'minimal importance,'" and the doctrine's applicability is strictly curtailed.[2]

¶3   We adopt a third approach. We conclude that the attenuation exception is limited to the general fact pattern that gave rise to its adoption in the United States Supreme Court—of a voluntary act of a defendant's free will (as in a confession or consent to search). For cases arising in the context of two parallel acts of police work—one unlawful and the other lawful—we interpret the Supreme Court's precedents to dictate the applicability of a different exception (inevitable discovery).

¶4   Our holding is rooted in our attempt to credit the terms of the attenuation doctrine as prescribed in the Supreme Court's opinions, while also respecting the parallel doctrine of inevitable discovery. Thus, we read the Court's attenuation cases to define the conditions for severing the proximate causal connection between a threshold act of police illegality and a subsequent, intervening act of a defendant's free will. And in the distinct setting of both unlawful and then lawful police activity, we deem the inevitable discovery doctrine to control. Because this case involves no independent act of a defendant's free will and only two parallel lines of police work, we hold that the attenuation doctrine is not implicated, and thus reverse the lower court's invocation of that doctrine in this case.

---

[1] *United States v. Green*, 111 F.3d 515, 522, 23 (7th Cir. 1997).

[2] *State v. Moralez*, 300 P.3d 1090, 1102 (Kan. 2013) (quoting *State v. Hummons*, 253 P.3d 275, 278 (Ariz. 2011)).

## I.  Background

¶5    In December, 2006, an anonymous caller left a message on a police drug tip line reporting "narcotics activity" at a South Salt Lake City residence. Police officer Douglas Fackrell subsequently conducted intermittent surveillance of the residence for approximately three hours over the course of about one week. During that time, the officer observed "short term traffic" at the home. The traffic was not "terribly frequent," but was frequent enough that it raised Officer Fackrell's suspicion. In Officer Fackrell's view, the traffic was more than one would observe at a typical house, with visitors often arriving and then leaving within a couple of minutes. Thus, the officer concluded that traffic at the residence was consistent with drug sales activity.

¶6    During his surveillance of the residence, Officer Fackrell saw Edward Strieff leave the house—though he did not see him enter—and walk down the street toward a convenience store. As Strieff approached the convenience store, Officer Fackrell ordered Strieff to stop in the parking lot. Strieff complied. Officer Fackrell testified that he detained Strieff because "[Strieff] was coming out of the house that [he] had been watching and [he] decided that [he'd] like to ask somebody if [he] could find out what was going on [in] the house." Officer Fackrell identified himself as a police officer, explained to Strieff that he had been watching the house because he believed there was drug activity there, and asked Strieff what he was doing there.

¶7    Officer Fackrell also requested Strieff's identification, which Strieff provided. Officer Fackrell then called dispatch and asked them to run Strieff's ID and check for outstanding warrants. Dispatch responded that Strieff had "a small traffic warrant." Officer Fackrell then arrested Strieff on the outstanding warrant and searched him incident to the arrest. During the search, the officer found a baggie of methamphetamine and drug paraphernalia in Strieff's pockets.

¶8    Strieff was charged with unlawful possession of methamphetamine and unlawful possession of drug paraphernalia. He moved to suppress the evidence seized in the search incident to his arrest, arguing that it was fruit of an unlawful investigatory stop. The State conceded that Officer Fackrell had stopped Strieff without reasonable articulable suspicion (given that Officer Fackrell had not seen Strieff enter the house, did not know how long he had been there, and knew nothing of him other than that

he left the house). The State argued, however, that the exclusionary rule did not bar the evidence seized in the search because the attenuation exception to the exclusionary rule applied.

¶9   The district court agreed and denied Strieff's motion to suppress and subsequent motion to reconsider. First, the district court found that Officer Fackrell "believed he had seen enough short-term traffic at the house to create a reasonable suspicion that the house was involved in drug activity," and thus that the purpose of the stop "was to investigate a suspected drug house." Second, while acknowledging that Officer Fackrell's belief that he had sufficient suspicion to stop Strieff was incorrect, the court concluded that "the stop was not a flagrant violation of the Fourth Amendment" but a "good faith mistake on the part of the officer as to the quantum of evidence needed to justify an investigatory detention." Finally, "[w]eighing the factors in their totality," the court found "suppression to be an inappropriate remedy," concluding that "the search was conducted after discovering an outstanding warrant and arresting the Defendant on that warrant, an intervening circumstance that Officer Fackrell did not cause and could not have anticipated."

¶10 Strieff entered a conditional guilty plea to charges of attempted possession of a controlled substance and possession of drug paraphernalia, reserving his right to appeal the order denying his motions to suppress and reconsider. The court of appeals affirmed under the attenuation exception to the exclusionary rule recognized in *Brown v. Illinois*, 422 U.S. 590 (1975). *State v. Strieff*, 2012 UT App 245, 286 P.3d 317. Applying the factors set forth in *Brown*, a majority of the court of appeals concluded that the discovery of an outstanding arrest warrant was a powerful "intervening circumstance" dissipating the taint of the unlawful detention, and that Officer Fackrell's detention of Strieff was not a "purposeful" or "flagrant" violation of the Fourth Amendment. *Id.* at ¶¶ 21, 27. And although the "temporal proximity" of the discovery of the warrant weighed against attenuation, the majority deemed that factor outweighed by the existence of an intervening circumstance and the lack of a purposeful or flagrant violation. *Id.* at 29–30, 37.

¶11 Judge Thorne dissented. He disagreed with the majority's analysis of the attenuation factors as applied to this case. *Id.* at ¶¶46, 48–50. And he expressed discomfort with what he saw as an

inconsistency between the outcome of this case and that of *State v. Topanotes*, 2003 UT 30, 76 P.3d 1159, a case arising under similar facts but decided under the inevitable discovery exception. Strieff filed a petition for certiorari, which we granted.

¶12 On certiorari, we review not the underlying decision of the district court but the ultimate decision of the court of appeals—a decision that merits no deference in our analysis. *See State v. Verde*, 2012 UT 60, ¶ 13, 296 P.3d 673. "That said, [t]he correctness of the court of appeals' decision turns, in part, on whether it accurately reviewed the district court's decision under the appropriate standard of review." *Id.* (alteration in original) (internal quotation marks omitted). And the deference, if any, we owe to the district court's decision varies depending on the nature of the determination in question.

¶13 First, any factual determinations made by the district court are entitled to substantial deference under a standard of review for clear error. *See Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 40, 308 P.3d 382. Second, to the extent the district court's decision implicated pure legal questions regarding the terms and conditions of the attenuation exception, the court's resolution of those questions is reviewed for correctness. *See Hi-Country Prop. Rights Grp. v. Emmer*, 2013 UT 33, ¶¶ 13–14, 304 P.3d 851 (noting that threshold legal determinations embedded within mixed determinations are reviewed for correctness like any other determination of law). Finally, the district court's application of the attenuation exception to the facts of this case is likewise a determination that is reviewed for correctness. *See State v. Worwood*, 2007 UT 47, ¶¶ 11–12, 164 P.3d 397. Although that decision is a "mixed" determination of fact and law, it is one of those decisions that is "law-like" in that our resolution of it lends itself to "consistent resolution by a uniform body of appellate precedent." *In re Baby B.*, 2012 UT 35, ¶ 44.

## II. The Exclusionary Rule and the Attenuation Doctrine

¶14 Although this case concerns a single exception to the exclusionary rule (attenuation), that exception is best conceptualized within the broader context of the rule and as one of a range of exceptions that define its limits. We accordingly start with first principles, explaining the basis for the rule and describing the contours of various exceptions that are related to the attenuation doc-

trine (independent source and inevitable discovery). From there we outline the elements of the attenuation exception as relevant to the disposition of this case. And we conclude this section by outlining the approaches that various lower courts (state and federal) have taken in cases involving the attenuation doctrine and the discovery of an outstanding arrest warrant.

## A. The Rule and its Exceptions

¶15 The Fourth Amendment protects against unreasonable searches and seizures. *See* U.S. CONST. amend. IV. The exclusionary rule is a judicial remedy that gives life to that protection. In its most basic terms, the exclusionary rule suppresses the admission of evidence obtained in violation of the Constitution. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961). It is a prudential doctrine, created by courts to "compel respect for the constitutional guaranty." *Davis v. United States*, __ U.S. __, 131 S. Ct. 2419, 2426 (2011) (citations omitted). There is no constitutional right to exclusion, nor is the doctrine designed to redress the injury occasioned by a Fourth Amendment violation. *Id.* (internal quotation marks omitted). The exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations." *Id.*

¶16 While deterrent value is a "necessary condition for exclusion," it is "not a sufficient one." *Id.* at 2427 (internal quotation marks omitted). Exclusion of otherwise-relevant and probative evidence from criminal proceedings "exacts a heavy toll on both the judicial system and society at large." *Id.* at 2427. The rule, after all, often "suppress[es] the truth and set[s] the criminal loose in the community without punishment." *Id.* at 2427 (internal quotation marks omitted).

¶17 The terms and conditions of the exclusionary rule must appropriately account for these concerns. Thus, "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.*

¶18 The exclusionary rule is far from absolute. In the simplest case for exclusion, evidence is "direct or primary in its relationship to the [police action]." 3 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE, § 9.3(a) (3d ed. 2007) (internal quotation marks omitted). In those cases, the connection between the illegal police action and the evidence is clear and close. In other cases, the challenged evidence is less directly connected to the illegality, but is

"secondary or derivative in character." *Id.* (describing as "secondary" or "derivative," examples such as "physical evidence located after an illegally obtained confession, or an in-court identification . . . made following an illegally conducted pretrial identification"). In these cases, there is a disconnect—factual, legal, or temporal—between the unconstitutional conduct and the evidence. These disconnects give rise to a series of exceptions to the exclusionary rule.

B. Independent Source, Inevitable Discovery, and Attenuation

¶19 Evidence seized as a result of an illegal search or seizure may be admitted under three "closely related but analytically distinct" exceptions to the exclusionary rule: (1) the independent source exception, (2) the inevitable discovery exception, and (3) the attenuation exception. *United States v. Terzado-Madruga*, 897 F.2d 1099, 1113 (11th Cir. 1990).

¶20 Under the independent source doctrine, the "taint" that is otherwise-attached to the fruit of police misconduct is removed when the same fruit is derived from lawful police activity. *See Murray v. United States*, 487 U.S. 533, 537 (1988). In the classic independent source scenario, "an unlawful entry has given investigators knowledge of facts *x* and *y*, but fact *z* has been learned by other means." *Id.* at 538. In *Segura v. United States*, 468 U.S. 796, 800–01 (1984), for example, drug enforcement agents unlawfully entered defendant's apartment and remained there until a search warrant was obtained. The United States Supreme Court deemed the evidence acquired pursuant to the valid, untainted warrant admissible because it was discovered pursuant to an "independent source." *Id.* at 813–14.

¶21 This exception has also been extended to circumstances where the fruit obtained through an independent source was *itself* previously obtained unlawfully—"that is, in the example just given, to knowledge of facts *x* and *y*," and not just *z*. *Murray*, 487 U.S. at 538. In *Murray*, drug enforcement agents entered a warehouse unlawfully and observed burlap-wrapped bales of marijuana, but then subsequently seized the same evidence upon execution of a valid search warrant. Assuming the agents "would have sought a warrant [even] if they had not earlier entered the warehouse" (a matter not resolved on the record in *Murray* and thus meriting a remand), the Supreme Court held that the execution of the war-

rant would remove the taint of the earlier unlawful entry. *Id.* at 542–43 (noting that the search pursuant to the warrant would not have been a "genuinely independent source . . . if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant") (footnote omitted).

¶22 The independent source doctrine thus turns on cause-in-fact analysis. A source is *independent*—in a manner removing the taint arising from a prior act of police misconduct—if it actually led to the discovery of the evidence in question and would have done so even in the absence of police misconduct. Where that is the case, there is no longer a sufficient deterrence-based justification for exclusion:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position that they would have been in if no police error or misconduct had occurred . . . .When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Nix v. Williams*, 467 U.S. 431, 443 (1984) (emphasis added) (footnote omitted) (citations omitted).

¶23 The inevitable discovery doctrine is related. Here the classic case is *Nix*. In *Nix*, the defendant had made incriminating statements in response to police investigation impinging on the right to counsel—which statements led police to the discovery of a victim's dead body. *Id.* at 435. But the record also indicated that a search had been underway that inevitably would have led to the discovery of the victim's body but for the defendant's unlawfully obtained statements. *Id.* at 448–50. And the *Nix* Court upheld the admissibility of the fruit of the unlawful investigation based on an inevitable discovery rationale—holding that "when, as here, the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no

nexus sufficient to provide a taint and the evidence is admissible." *Id*. at 448.

¶24 Both the independent source doctrine and the inevitable discovery exception are rooted in cause-in-fact analysis. The former forecloses exclusion when tainted fruits are actually obtained through a truly independent source. The latter prescribes the same result if the tainted evidence inevitably *would have been discovered* by lawful means.

¶25 The attenuation exception is distinct. It turns not on cause-in-fact analysis but on a question of *legal* cause. Thus, under *Wong Sun v. United States*, 371 U.S. 471 (1963), and *Brown v. Illinois*, 422 U.S. 590 (1975), evidence that would not have been secured but for an unlawful search or seizure is nonetheless admissible if the legal nexus between the police misconduct and the challenged evidence is sufficiently attenuated that any tainting of the evidence is dissipated. *Wong Sun*, 371 U.S. at 487–88 (declining to "hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light *but for* the illegal actions of the police") (emphasis added) (internal quotation marks omitted)).

¶26 In *Wong Sun*, federal drug agents arrested the defendant without probable cause, but he returned to the station house several days later and gave a voluntary confession. *Id.* at 491. The Court ruled that drugs seized pursuant to the unlawful arrest were properly excluded as fruit of a poisonous tree. *Id*. at 487 (noting that "this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence 'from an independent source'"). As to the confession, however, the Court held that it might escape exclusion even if "it would not have come to light but for the illegal actions of the police." *Id*. at 488. Specifically, the Court held that the admissibility of the confession should turn on "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id*. (internal quotation marks omitted).

¶27 Ultimately, the *Wong Sun* Court held the confession admissible under this standard. "On the evidence that Wong Sun had been released on his own recognizance after a lawful arraignment,

and had returned voluntarily several days later to make the statement," the Court held "that the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.'" *Id.* at 491.

¶28  The *Wong Sun* standard was extended in *Brown*. There, the defendant was also arrested without probable cause and gave a subsequent confession, but this time the confession came within two hours after the arrest. *Brown*, 422 U.S. at 604. The *Brown* Court found such a confession not to satisfy the fact-intensive, case-by-case analysis called for under the attenuation doctrine. *Id.* at 604–05. In so doing, however, the Court articulated three factors of relevance to the analysis: the "temporal proximity of the arrest and the confession"; the "presence of intervening circumstances"; and the "purpose and flagrancy of the official misconduct." *Id.* at 603–04. These factors weighed in favor of exclusion in *Brown* because the confession was given just two hours after the arrest without any intervening event of any significance, and the arrest was patently illegal and undertaken "in the hope that something might turn up." *Id.* at 605.

¶29  The Court reached a similar conclusion in *Kaupp v. Texas*, 538 U.S. 626 (2003). There the Court applied the *Brown* factors and found the defendant's confession to be the fruit of his prior illegal arrest. *Id.* at 633. In so doing the Court emphasized that (1) there was "no indication . . . that any substantial time passed between Kaupp's removal from his home in handcuffs and his confession after only 10 or 15 minutes of interrogation"; (2) at least some of the six officers involved in taking him into custody "were conscious that they lacked probable cause to arrest"; and (3) "the State ha[d] not even alleged 'any meaningful intervening event' between the illegal arrest and Kaupp's confession." *Id.* at 633.

¶30  Thus, the attenuation exception eschews the "but for" approach to causation that drives the independent source and inevitable discovery exceptions. *See United States v. Ceccolini*, 435 U.S. 268, 276 (1978) (noting that the Court has "declined to adopt a 'per se' or 'but for' rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest"). It instead endorses a more nuanced analysis akin to proximate causation. In asking whether the attenuation exception applies, we assess whether the causal chain has been broken by in-

tervening circumstances.[3] And we do so in the light of the exclusionary rule's deterrence function. Thus, we "mark the point at which the detriment of illegal police action becomes so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." LaFave et al., *supra* , § 9.3(c)).

## C. The Attenuation Factors

¶31 The Supreme Court has set out (and we have applied) a three-factor test to guide the attenuation inquiry. The three factors are: (1) the "temporal proximity" of the unlawful detention and the discovery of incriminating evidence, (2) the presence of "intervening circumstances," and (3) the "purpose and flagrancy" of the official misconduct. *Brown*, 422 U.S. at 603–04 (1975); *State v. Arroyo*, 796 P.2d 684, 690 n.4 (Utah 1990).

¶32 The threshold inquiry for attenuation analysis concerns the existence of "intervening circumstances." Such circumstances are those that establish a break in the legal chain of events leading to the discovery of the evidence at issue. *See United States v. Green*, 111 F.3d 515, 522 (7th Cir. 1997). Thus, a circumstance is "intervening" if it is so distinct from the threshold Fourth Amendment violation that it can be said that the challenged evidence is not a product of "exploitation" of the illegality but instead the result of "'means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun*, 371 U.S. at 488 (internal quotation marks omitted).

¶33 A prototypical intervening circumstance involves a voluntary act by the defendant, such as a confession or consent to search given after illegal police action. A voluntary confession or consent to search might be the but-for product of an unlawful search or seizure, but exclusion is foreclosed where the defendant's voluntary act is sufficiently independent to break the legal connection to the primary violation. Under the caselaw, the independence of such voluntary acts is established, for example, where the confession or consent comes well after termination of a

---

[3] *See* Albert W. Alschuler, *Herring v. United States: A Minnow or a Shark?*, 7 Ohio St. J. of Crim. Law 463, 478-79 (2009) (noting the Supreme Court's use of attenuation as "refer[ring] to situations in which the causal chain between a Fourth Amendment violation and the seizure of evidence ha[s] been broken.").

defendant's illegal detention, after defendant's consultation with counsel, or as a spontaneous comment not in response to any police interrogation. *See* LAFAVE, *supra*, § 9.4(a). Increasingly, courts have extended this principle to the discovery of an outstanding arrest warrant, *see infra* ¶ 38 n.5, a question to which we will turn shortly.

¶34 Under the governing standard set forth in *Brown*, the question whether a particular circumstance is sufficiently "intervening" to dissipate the taint associated with a primary Fourth Amendment violation "must be answered on the facts of each case." *Brown*, 422 U.S. at 603. And that analysis, in turn, depends on the relationship between the "intervening circumstance" factor, on one hand, and the "purpose and flagrancy" and "temporal proximity" considerations, on the other.

¶35 Conduct is "purposeful" if it is "investigatory in design and purpose and executed in the hope that something might turn up." *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (internal quotation marks omitted). "Flagrant" conduct is that which is obviously improper—so far beyond the bounds of the Fourth Amendment that law enforcement must have seen it as unlawful but chose to engage in it anyway. *See id.*

¶36 Generally, close "temporal proximity" between the illegality and discovery of the evidence weighs in favor of suppression. *See State v. Shoulderblade*, 905 P.2d 289, 293 (Utah 1995). Thus, a "brief time lapse" between a Fourth Amendment violation and the evidence obtained may "indicate[] exploitation because the effects of the misconduct have not had time to dissipate." *Id.*

### D. Attenuation and Outstanding Arrest Warrants

¶37 To date, the United States Supreme Court's attenuation cases have all involved *confessions* made by unlawfully detained individuals.[4] Thus, the question presented here—of the applicabil-

---

[4] *See, e.g.*, *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (suppressing defendant's murder *confession* following unlawful arrest); *Taylor v. Alabama*, 457 U.S. 687, 694 (1982) (excluding a *confession* after finding insufficient attenuation); *Dunaway v. New York*, 442 U.S. 200, 219 (1979) (excluding a *confession* obtained after an unlawful arrest); *Brown v. Illinois*, 422 U.S. 590, 605 (1975) (holding that a confession was sufficiently attenuated); *Wong Sun v. United States*, 371

ity of the attenuation doctrine to the discovery of an outstanding arrest warrant in the course of an unlawful arrest or detention—is a matter heretofore left to the lower courts.

¶38 Three principal approaches have emerged on this issue. One set of decisions, exemplified by *United States v. Green*, 111 F.3d at 522, concludes that an outstanding arrest warrant may qualify as "an even more compelling case" for an "intervening circumstance" than a voluntary confession. *Id.* [5] The threshold basis for this determination in *Green* was the assertion that "[i]t would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant—in a sense requiring an official call of 'Olly, Olly, Oxen Free.'" *Id.* at 521. In addition, the *Green* court suggested that an outstanding warrant is in some sense more independent of lawful police activity than a voluntary confession. The basis for that conclusion was the assertion that "[a]ny influence the unlawful stop would have on the defendant's con-

---

U.S. 471, 478–79 (1963) (excluding evidence of narcotics obtained through unlawfully obtained and tainted *confession*).

This is a complete list of United States Supreme Court cases applying the attenuation *doctrine*. But it is certainly not an exhaustive list of cases in which the Court has employed the term "attenuation" in framing the exclusionary rule. That term has been used in reference to a general principle of causation, in connection with other principles of and exceptions to the exclusionary rule. *See Hudson v. Michigan*, 547 U.S. 586, 593 (2006) (holding that a violation of the knock-and-announce rule was sufficiently attenuated); *United States v. Leon*, 468 U.S. 897, 911 (1984) (stating that the police misconduct and the evidence of crime "may be sufficiently attenuated" to be admissible); *Segura v. United States*, 468 U.S. 796, 805 (1984) (explaining the inevitable discovery doctrine in general attenuation terms).

[5] *See United States v. Simpson*, 439 F.3d 490, 495 (8th Cir. 2006) (adopting *Green*'s "compelling case" language); *State v. Hill*, 725 So.2d 1282, 1287 (La. 2008) (stating that the discovery of outstanding warrants was a "significant intervening event"); *Hardy v. Commonwealth*, 149 S.W.3d 433, 436 (Ky. App. 2004) (holding that the intervening circumstance of the outstanding warrant "outweighed any possible [police] misconduct").

13

duct is irrelevant," and thus that "there is less 'taint' than in the cases already recognized by the Supreme Court and this and other circuits as fitting within the intervening circumstances exception. *Id*. at 522. Thus, the *Green* court extended the attenuation doctrine to a case involving the discovery of an outstanding warrant in the course of an unlawful arrest.[6] It did so on the basis of its conclusion that the "purpose" of the stop in question was not to seek evidence against the defendant in question (Green) but "to obtain evidence against" a third party (Williams), and that there was "no evidence of bad faith on the part of the police," or any indication that "the police exploit[ed] the stop in order to search [Green's] automobile." *Id*. at 523.[7]

---

[6] Within this first approach to attenuation, there appears to be two lines of cases. One line expressly characterizes the discovery of an outstanding warrant as a "compelling case" for an intervening circumstance (as in *Green*). *See, e.g., Simpson*, 439 F.3d at 496 (holding that defendant's outstanding arrest warrant constituted an "extraordinary intervening circumstance"); *People v. Murray*, 728 N.E.2d 512, 516 (Ill. App Ct. 2000) (adopting *Green*'s analysis as "instructive"). A second line deems the outstanding warrant a dispositive consideration, but without any express characterization of the warrant as a "compelling" or "extraordinary" intervening circumstance. *See, e.g., McBath v. State*, 108 P.3d 241, 248–49 (Alaska Ct. App. 2005); *People v. Brendlin*, 195 P.3d 1074, 1080 (Cal. 2008); *People v. Hillyard*, 589 P.2d 939, 941 (Colo. 1979); *State v. Frierson*, 926 So. 2d 1139, 1144 (Fla. 2006); *State v. Cooper*, 579 S.E.2d 754, 758 (Ga. App. 2003); *State v. Page*, 103 P.3d 454, 460 (Idaho 2004); *Quinn v. State*, 792 N.E.2d 597, 602 (Ind. Ct. App. 2003); *State v. Martin*, 179 P.3d 457, 458–63 (Kan. 2008); *Hill*, 725 So.2d at 1285; *Cox v. State*, 916 A.2d 311, 323 (Md. 2007); *People v. Reese*, 761 N.W.2d 405, 412 (Mich. Ct. App. 2008); *State v. Grayson*, 336 S.W.3d 138, 147 (Mo. 2011) (en banc); *State v. Thompson*, 438 N.W.2d 131, 137 (Neb. 1989); *Jacobs v. State*, 128 P.3d 1085, 1089 (Okla. Crim. App. 2006); *State v. Dempster*, 434 P.2d 746, 748 (Or. 1967) (abrogated by *State v. Bailey*, 338 P.3d 702 (Or. 2014); *Lewis v. State*, 915 S.W.2d 51, 54 (Tex. Ct. App. 1995).

[7] *See also Page*, 103 P.3d at 459 (finding attenuation in conjunction with a conclusion that police conduct was neither flagrant nor motivated by an improper purpose); *Quinn*, 792 N.E.2d at 602

¶39 A second set of cases deems the discovery of an outstanding warrant a matter of "'minimal importance'" under the attenuation factors set out in *Brown*, and thus carefully limits the doctrine's applicability in the warrant scenario. *See State v. Moralez*, 300 P.3d 1090, 1102 (Kan. 2013).[8] These cases are motivated by the concern that "[w]ere it otherwise, law enforcement officers could randomly stop and detain citizens, request identification, and run warrants checks despite the lack of any reasonable suspicion to support the detention." *Id.* at 1102.[9] And they narrowly circumscribe the applicability of the attenuation doctrine by concluding that (a) the short time between an unlawful detention and a search incident to an arrest on an outstanding warrant "weighs heavily"

---

(finding "no evidence suggesting any impropriety as the purpose for stopping Quinn").

[8] *See also United States v. Gross*, 662 F.3d 393, 404–06 (6th Cir. 2011) (holding that the discovery of a valid warrant is a factor but is not "dispositive"); *State v. Bailey*, 338 P.3d 702, 704 (Or. 2014) (en banc) (overruling prior precedent establishing a *per se* rule that outstanding warrants attenuate taint and concluding that "the weight assigned to the discovery of the arrest warrant depends on the degree to which it was the direct consequence or objective of the unlawful detention"); *State v. Mazuca*, 375 S.W.3d 294, 306 (Tex. Crim. App. 2012) (holding that the discovery of an outstanding arrest warrant "should not be overemphasized to the ultimate detriment of the goal of deterrence that animates the exclusionary rule").

[9] *See also People v. Padgett*, 932 P.2d 810, 816–17 (Colo. 1997) (holding that the subsequent discovery of a possible warrant did not overcome the other factors favoring suppression); *People v. Mitchell*, 824 N.E.2d 642, 650 (Ill. App. Ct. 2005) (justifying the refusal to extend the attenuation doctrine on the ground that suppression "appears to be the only way to deter police from randomly stopping citizens for the purpose of running warrant checks"); *State v. Soto*, 179 P.3d 1239, 1244–45 (N.M. Ct. App. 2008) (relying on *Mitchell*, holding that an outstanding warrant did not sufficiently remove the taint of the initial unlawful conduct).

against attenuation,[10] and (b) an improper detention followed by a warrant search "often will[] demonstrate at least some level of flagrant conduct"—of an "investigatory detention[] designed and executed in the hope that something might turn up"—even if "the detention is brief and the officers are courteous," *id.* at 1103.

¶40 The third approach to the attenuation doctrine takes the second a step further. Under this third approach, an outstanding warrant is less than a factor of "minimal importance" under the attenuation doctrine; it is a matter that just doesn't implicate the doctrine at all. This approach was articulated in a dissenting opinion in *State v. Frierson*, 926 So.2d 1139 (Fla. 2006) (Pariente, C.J., dissenting). In the *Frierson* case, Chief Justice Pariente proposed to limit the attenuation doctrine to its original basis—to cases involving voluntary confessions resulting from an independent act of a defendant's "free will"—and thus to decline to extend it to circumstances involving the discovery of an outstanding warrant. *Id.* at 1149–50 (relying on *Brown*'s articulation of the attenuation doctrine in terms of "whether a confession [that] is the product of a free will" can be deemed an "intervening event" cutting off the causal connection to the unlawful arrest). Because "the defendant's free will plays no role in the discovery of evidence in a search incident to arrest pursuant to an active warrant discovered during an illegal stop," Chief Justice Pariente asserted that the latter circumstance "bears little resemblance to that of a defendant who confesses or consents to a search for reasons that may be attenuated from the illegality of the stop." *Id.* at 1150. And the *Frierson* dissent accordingly would have declined to extend the attenuation doctrine to cases involving an unlawful detention leading to the discovery of an outstanding warrant, concluding that in this scenario "[t]here is no break in the chain of circumstances from the illegal detention to the discovery of evidence in the form of an act of free will on the part of the defendant." *Id.* at 1151.

---

[10] *See also Padgett*, 932 P.2d at 816–17 (stating that the evidence was obtained directly as a result of the unlawful stop "without sufficient intervening time and circumstances to carry the prosecutions' burden of proof to demonstrate dissipation of the taint"); *Bailey*, 338 P.3d at 713 (stating that the short time between the unlawful detention and the discovery of the challenged evidence makes it "less likely" to "break . . . the causal chain").

### III. Attenuation as Applied to This Case

¶41 The threshold question presented concerns the applicability of the attenuation doctrine to cases involving the discovery of an outstanding warrant in the course of an unlawful detention. Strieff urges a view of attenuation along the lines of the *Frierson* dissent described above, asking us to restrict the doctrine to circumstances involving an independent act of a defendant's "free will" in confessing to a crime or consenting to a search. And because the discovery of an outstanding warrant is not an independent act of free will but a direct result of an unlawful detention, Strieff asks us to deem the attenuation doctrine inapplicable.

¶42 We reverse on that basis. For a number of reasons, we conclude that attenuation is limited to the circumstances of the cases embracing this doctrine in the Supreme Court—involving a defendant's independent acts of free will. And in the distinct circumstance involving the discovery of an outstanding warrant, we conclude that a different doctrine—the inevitable discovery exception—controls.

¶43 The origins of attenuation are in cases involving independent acts of criminal defendants. *Wong Sun*, *Brown*, and *Kaupp* all involved a confession given by a defendant after an initial unlawful arrest.[11] And the logic and terms of the attenuation doctrine developed in these cases are focused on separating the initial police illegality from the subsequent, independent acts of a defendant.

¶44 The seminal decision in *Brown* speaks in terms of whether a defendant's "statements (verbal acts, as contrasted with physical evidence) were of sufficient free will as to purge the primary taint of the unlawful arrest." 422 U.S. 590, 600 (1975). And the *Brown* Court quoted *Wong Sun*'s formulation of the central inquiry under the attenuation doctrine in parallel terms—of whether a defendant's voluntary statement was "'sufficiently an act of free will to purge the primary taint'" of the unlawful arrest. *Id.* at 602 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486–87 (1963)).

¶45 The significance of a defendant's independent act of "free will" is also arguably inherent in the proximate cause premises of the *Brown* formulation. Attenuation is focused on *intervening cir-*

---

[11] *See supra* ¶ 37, n.4.

*cumstances* sufficient to break the proximate connection to the initial violation of the Fourth Amendment. An *intervening* cause is a "means sufficiently distinguishable" from the threshold illegality that the taint of the initial violation is purged. *Hudson v. Michigan*, 547 U.S. 586, 592 (2006) (internal quotation marks omitted). The terminology is significant. In proximate cause parlance, an *intervening cause* is a subsequent, independent occurrence that materially contributes to the result. *See McCorvey v. Utah State Dep't. of Transp.*, 868 P.2d 41, 45 (Utah 1993); RESTATEMENT (SECOND) OF TORTS § 442 (1965). Such a cause cuts off the legal causal connection to the act of an initial tortfeasor where the intervening cause is not foreseeable (and is thus a *superseding cause*). *See Cruz v. Middlekauff Lincoln-Mercury, Inc.*, 909 P.2d 1252, 1257 (Utah 1996).

¶46 This concept cannot easily be extended to the discovery of an outstanding warrant. The discovery of an outstanding warrant is hardly an independent act or occurrence. It is part of the natural, ordinary course of events arising out of an arrest or detention. And in that sense, even if the warrant could be thought of as somehow intervening, it would hardly be unforeseeable. So to the extent the attenuation doctrine is about proximate cause, *see supra* ¶ 45, an outstanding warrant does not qualify, as it is not an independent act that is sufficiently removed from the primary illegality to qualify as *intervening*.

¶47 The attenuation factors articulated by the Supreme Court also seem to cut in the same direction. First, consideration of the "temporal proximity of the arrest and the confession," *Brown*, 422 U.S. at 603, reinforces the centrality of proximate cause analysis. If an extended time lapse is a plus factor for attenuation—as it clearly is as the test has been formulated—the focus must necessarily be on independent acts removed from the primary act of police misconduct. Indeed, applying this factor to the discovery of an independent warrant would turn the inquiry on its head. In the context of an unlawful detention followed by a warrants check, temporal delay would logically count in favor of the government. The constitutional violation in a *Terry* stop, after all, is a product of the unreasonable delay associated with an individual's detention by the government. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985). So the government could hardly assert the lack of "temporal proximity" in the discovery of a search warrant as a

basis for attenuation (and thus avoidance of the exclusionary rule).

¶48 Second, the *Brown* Court's formulation of the "purpose and flagrancy" factor is also ill-suited to the outstanding warrant scenario. In *Brown*, the Court's application of this factor was focused on the "manner in which [the defendant's] arrest was affected," with particular attention to whether that "manner" gave "the appearance of having been calculated to cause surprise, fright, and confusion." 422 U.S. at 605. This, again, is an outgrowth of the inquiry into proximate causation, as a purposeful attempt at "surprise, fright, and confusion" could predictably yield a confession that would be entirely foreseeable (and thus connected to—and hardly independent of—the primary police misconduct). And that assessment would have little application to the outstanding warrant scenario, where "surprise, fright, and confusion" are utterly irrelevant.

¶49 These are indications that the Supreme Court's attenuation doctrine is directed only at intervening circumstances involving a defendant's independent acts of free will (such as a confession and perhaps a consent to search). An even stronger signal appears in the terms of a parallel doctrine, the inevitable discovery exception. As noted above, this exception exempts from exclusion evidence that is the but-for result of police misconduct but that also would inevitably have been produced by untainted police work. *See Nix v. Williams*, 467 U.S. 431, 448–50 (1984). This doctrine is directly implicated in a case like this one, involving two parallel acts of police work—one a violation of the Fourth Amendment (detention without reasonable suspicion) and the other perfectly legal (execution of an outstanding arrest warrant). *See State v. Topanotes*, 2003 UT 30, ¶ 22, 76 P.3d 1159 (holding, in a case involving an unlawful detention leading to the discovery of an outstanding warrant, that evidence uncovered in a search incident to arrest on the warrant did not qualify under the inevitable discovery exception and thus was subject to suppression). And extension of the attenuation doctrine to the outstanding warrant scenario would eviscerate the inevitable discovery exception.

¶50 That prospect is troubling. Ordinarily, where lawful police work runs in tandem with an illegal parallel, the taint of the latter is tough to eliminate. Under *Nix*, our law does not lightly excuse an initial Fourth Amendment violation on the ground that it was

paralleled by a lawful investigation. Instead we insist on exclusion unless the fruits of the lawful investigation would *inevitably* have come about regardless of the unlawful search or seizure. That approach would require exclusion in this case, as our decision in the *Topanotes* case indicates. *See Topanotes*, 2003 UT 30, ¶ 20–21. Granted, Strieff was lawfully arrested on an outstanding arrest warrant, and a search incident to arrest was thus also perfectly appropriate.[12] But given that that arrest and search came about as a but-for result of his unlawful detention, exclusion would still be required under *Nix* unless the contraband he possessed would *inevitably* have been discovered in the absence of the threshold unlawful detention. And such a showing would be difficult at best in a case like this one, as we cannot know whether Strieff might ultimately have had this contraband in his possession on any future date on which he may have been arrested on the outstanding warrant.

¶51 Extension of the attenuation doctrine to this scenario would blur the lines of the inevitable discovery exception. If attenuation is a free-wheeling doctrine unmoored from voluntary acts of a defendant's free will, then the limits of the *Nix* formulation of inevitable discovery would be substantially curtailed. If *Brown*, and not *Nix*, prescribes the standard for *lawful* police conduct removing the taint from *unlawful* acts, then *inevitability* would no longer be the standard. Instead, it would be enough for the prosecution to assert that an initial act of police misconduct was insufficiently "purposeful and flagrant" and lacking in "temporal proximity" to a lawful investigation to sustain exclusion.

¶52 No court has yet extended the attenuation doctrine this far. To date, the courts that have deemed the *Brown* factors to apply to the outstanding warrant scenario seem to treat a search incident to an arrest on an outstanding warrant as a unique form of lawful police work. But there is no logical reason to treat such a search any differently from any other form of police work. So the logic of

---

[12] For this reason the professed concern about the lawfulness of the *arrest* on the outstanding warrant, *see Green v. United States*, 111 F.3d 515, 521 (7th Cir. 1997), is a red herring. The exclusionary rule (with its attendant exceptions) is about exclusion of evidence. No one is contesting—or even could reasonably contest—the arrest on the outstanding warrant.

the decisions extending *Brown* to the outstanding warrant scenario will, if taken seriously, ultimately swallow the inevitable discovery exception.

¶53 And even if these decisions are not taken to their logical end, the resulting legal landscape (as it currently stands in many jurisdictions) is untenable. Under the prevailing law in an increasing number of jurisdictions, one form of lawful police work (a search incident to an arrest on an outstanding warrant) is favored above all others (such as the completion of an outstanding investigation, as in *Nix*). This is equally problematic. A search incident to arrest on an outstanding warrant has no favored status under the Fourth Amendment. It is entirely arbitrary to subject most lawful police work (pursued in tandem with *unlawful* activity) to the high bar of inevitable discovery while lowering the bar for arrests incident to an outstanding warrant.

¶54 We cannot adopt this premise without overriding the *Nix* formulation of the inevitable discovery exception. And because we construe the *Brown* formulation of attenuation to be limited to cases involving a defendant's independent acts of free will, we deem the attenuation doctrine inapplicable here, and reverse the court of appeals on that basis. We therefore hold that Strieff was entitled to suppression of the evidence secured in the search incident to his arrest in this case, as the attenuation doctrine advanced by the State in opposition to that motion was not a viable exception to the exclusionary rule in this case.

## IV. Conclusion

¶55 The terms and conditions of the exclusionary rule have been meted out by the Supreme Court in a piecemeal, common-law fashion.[13] On matters not yet addressed by that Court, the lower courts are left to fill in the gaps. This case implicates a gap of substantial significance. And the courts that have addressed it have come to substantially different conclusions.

¶56 The confusion, in our view, stems from a threshold misunderstanding of the scope of attenuation. Thus, the reason the courts have struggled to arrive at a consensus formulation of at-

---

[13] *See* Omar Saleem, *The Age of Unreason: The Impact of Reasonableness, Increased Police Force, and Colorblindness on* Terry *"Stop and Frisk"*, 50 OKLA. L. REV. 451, 460 (1997).

tenuation as applied to the outstanding warrant scenario is that the doctrine has no application in this circumstance. In the absence of guidance from the United States Supreme Court, courts such as ours are left with only tea leaves. We are mindful, in today's effort to fill this gap in Fourth Amendment law, of the distinct doctrines of attenuation and inevitable discovery. To preserve the analytical distinction between the two, attenuation should be limited to cases involving intervening acts of a defendant's free will. That holding, which we adopt today, avoids the analytical dilemmas that are currently troubling the lower courts (as to whether an outstanding warrant is of "compelling" or "minimal" importance, as to the significance of the "temporal proximity" factor, and as to the application of the "purpose and flagrancy" factors). Ultimately, the United States Supreme Court may chart a different course. Such is its constitutional prerogative. Ours is to make sense of and apply existing precedent, to fill in gaps by reading any and all tea leaves available to us.

———————