2004 UT App 164

**STATE of Utah, Plaintiff and Appellee,**

v.

**Afton Dale CALLAHAN, Defendant and Appellant.**

No. 20030128–CA.

Court of Appeals of Utah.

May 13, 2004.

James K. Slavens, James K Slavens Esq, Fillmore, for Appellant.

Mark L. Shurtleff, atty. gen., and Joanne C. Slotnik, asst. atty. gen., Salt Lake City, for Appellee.

Before Judges JACKSON, ORME, and THORNE, Jr.

## OPINION

THORNE, Jr., Judge:

¶ 1 Afton Callahan appeals from the trial court's denial of his motion to suppress and his subsequent conditional guilty plea to distributing a controlled substance in a drug free zone, a first degree felony, in violation of Utah Code Annotated section 58–37–8 (2002). We reverse.

## BACKGROUND

¶ 2 The Central Utah Narcotics Task Force (Task Force) is charged with the responsibility of investigating drug crimes in central Utah and is comprised of five officers and an intelligence official. The Task Force relies on confidential informants to further their investigations. At 11:00 a.m. on the morning of March 19, 2002, a confidential informant (CI) informed Task Force Officer Jeff Whatcott that Afton Callahan would, later that day, have methamphetamine to sell. Whatcott told the CI to keep him informed and the CI promised to do so. The

CI left work at about 5:00 p.m. without having talked to Callahan and having nothing to relate to Whatcott. After leaving work, the CI purchased some beer and spent the next two hours drinking. The CI then visited Callahan's home where he determined that methamphetamine was available, and, after ingesting a sample, he made arrangements to make a purchase later that night. The CI left Callahan's and contacted Whatcott. The CI told Whatcott that he had arranged a buy. Whatcott told the CI that they needed to meet immediately. At 9:00 p.m. Whatcott, along with several other Task Force members, met with the CI. There they discovered that the CI had been drinking. Consequently, Whatcott monitored the CI and plied him with "several cups of coffee" to ensure that the CI was "competent enough to do the job." They were not, however, aware that he had consumed methamphetamine prior to the meeting.

¶3 When Whatcott finally concluded that the CI was sober enough to perform his function, he searched the CI and gave him a transmitter, through which the Task Force intended to listen to the transaction. Whatcott also gave the CI a one-hundred-dollar bill to complete the buy, told him to give the prearranged signal when the sale was complete, and sent him into Callahan's residence. After the CI entered the home, the Task Force officers monitored the transaction. Although the transmission was unclear, the officers felt confident that drugs had been discussed, and when they heard the CI utter the prearranged signal that the buy was complete the Task Force rushed into the home. Without consent, the officers entered through a wooden door that led to an enclosed porch. On the porch they found the CI, Callahan, and a third man.[1] The men were placed on the ground, searched, and restrained. The Task Force officers found a packet containing methamphetamine in the CI's pocket, but they found nothing on the other men. However, on the floor of the enclosed porch, they did find a baggie that contained four or five smaller baggies, each of which contained a white powder that was consistent with methamphetamine. The officers then obtained Callahan's consent to search the home. The subsequent search disclosed paraphernalia but no additional narcotics. Consequently, Callahan was arrested and charged with possession of a controlled substance with intent to distribute, distribution of a controlled substance, and possession of drug paraphernalia.

¶4 Callahan filed a motion to suppress the evidence, which the trial court initially denied, but the court also indicated a willingness to later revisit the issue. As the trial neared its conclusion, Callahan renewed his motion to suppress. The State responded that the warrantless entry into the home was justified by exigent circumstances. The trial court agreed with the State and denied Callahan's motion. Following the trial court's decision, Callahan entered into a conditional plea agreement with the State, reserving the right to contest the trial court's evidentiary ruling. He now appeals the trial court's suppression order.

## ISSUE AND STANDARD OF REVIEW

¶5 Callahan argues that the trial court erred in denying his motion to suppress the evidence. "In reviewing a trial court's ruling on a motion to suppress evidence, we will not overturn its factual findings absent clear error. The trial court's legal conclusions, however, we review for correctness." *State v. Valenzuela*, 2001 UT App 332, ¶8, 37 P.3d 260 (quotations, citations, and alteration omitted).

## ANALYSIS

¶6 Callahan argues that the trial court erred when it determined that the Task Force officers' entry into his home without a warrant was justified due to the exigent circumstances that existed at the time of their entry. "[W]arrantless searches and seizures within a home or other private premises are per se unreasonable absent exigent circumstances" and probable cause. *State v. Beavers*, 859 P.2d 9, 13–14 (Utah Ct.App.1993).

---

1. Soon after entering the home, the officers also discovered a fourth man, whom they then detained, searched, and restrained. We need not discuss the identities or dispositions of the other men found in the home as they are not material to this case.

An officer is faced with exigent circumstances when a reasonable person in the officer's shoes would " 'believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect,' " or to prevent the improper frustration of legitimate law enforcement efforts. *Id.* at 18 (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.1984)).

¶ 7 Here, the State concedes that the trial court erred in finding that the entry was justified by exigent circumstances.[2] However, although it concedes that the trial court erred in one respect, the State offers an alternative theory to affirm the trial court's ruling.

¶ 8 The State, for the first time on appeal, argues that the Task Force officers inevitably would have discovered the evidence found in the CI's pocket based upon their routine and standard police practices. "The exclusionary rule prohibits the use at trial of evidence, both primary and derivative (the 'fruit of unlawful police conduct'), obtained in violation of an individual's constitutional and statutory rights." *State v. Topanotes*, 2003 UT 30,¶ 13, 76 P.3d 1159 (citation omitted). The principle purpose of the exclusionary rule is to deter unlawful police conduct through denial of the use of evidence obtained through the unlawful behavior. *See id.* However, " '[i]f the prosecution can establish by a preponderance of the evidence that the [evidence] ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received.' " *Id.* at ¶ 14 (quoting *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377

(1984)). In Utah, " 'an entirely independent, alternate, intervening, appreciably attenuated investigation aside from the tainted investigation,' is not required to prove inevitable discovery." *Id.* at ¶ 15 (quoting *State v. James*, 2000 UT 80,¶¶ 15–16, 13 P.3d 576). However, "[f]or courts confidently to predict what *would* have occurred, but did not actually occur, there must be persuasive evidence of events or circumstances *apart from* those resulting in illegal police activity that would have inevitably led to discovery." *Id.* at ¶ 16 (emphases added).

It is well settled that an appellate court may affirm the judgment appealed from "if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action, and this is true even though such ground or theory is not urged or argued on appeal by appellee, was not raised in the lower court, and was not considered or passed on by the lower court."

*Id.* at ¶ 9 (quoting *Bailey v. Bayles*, 2002 UT 58,¶ 10, 52 P.3d 1158). However, "[a]lternative grounds for affirmance that are raised for the first time on appeal must be supported and sustained by the record and the factual findings of the court." *Id.* at ¶ 22.

¶ 9 In *Topanotes*, the supreme court stated that "[r]outine or standard police procedures are often a compelling and reliable foundation for inevitable discovery, even if not part of a separate, concurrent investigation." *Id.* at ¶ 17. However, for the evidence to be admissible when only one investigative action is involved, a court must find that the investigation "would have developed an indepen-

---

2. In essence, the trial court determined that the presence of narcotics, or the possibility of additional drug sales, created an exigent circumstance that justified the Task Force's entry into the home. The court found no threat to person or evidence, and nothing in the record suggests that Callahan knew, or had reason to suspect, that he was being monitored by any police agency. Consequently, the Task Force entry was not justified under the doctrine of exigent circumstances. *See United States v. Radka*, 904 F.2d 357, 362 (6th Cir.1990) ("A warrantless entry to prevent the loss or destruction of evidence is justified, if the government demonstrates: (1) a

reasonable belief that third parties are inside the dwelling; and (2) a reasonable belief that the loss or destruction of evidence is imminent. The mere possibility of loss or destruction of evidence is insufficient justification. Affirmative proof of the likelihood of the destruction of evidence, along with the necessity for warrantless entry are required." (citations omitted)).

We commend the State for its careful review and its decision to concede the exigent circumstance issue. We further note that such concessions reflect the duty of prosecutors not simply to serve as advocates, but also to serve as guardians of the community justice system.

dent, *legal* avenue for discovery of the evidence in question." *Id.* (emphasis added). The State suggests that the present situation fits well within this model. In effect, the State argues that had the Task Force not illegally entered and searched Callahan's home, as well as all of the people in the home, the CI would have left the home and presented the Task Force with the methamphetamine. As enticing as the State's argument might be, as clearly stated in *Topanotes,* "the argument that ' "if we hadn't done it wrong, we would have done it right," ' is far from compelling." *Id.* at ¶ 19 (citations omitted). Accepting the State's position would leave us ignoring not only the Task Force's illegal search, but also the fact that the Task Force's illegal entry was planned from the start. We cannot ignore these facts, and in light of the Task Force's plan, the only inevitability that we can detect is the Task Force's illegal entry following the CI's signal that the drug buy was complete.

¶ 10 Moreover, although the State urges us to rely on routine or standard police procedure in examining this issue, in the face of the Task Force's planned illegality, we are loath to do so. Our role, in evaluating the State's argument, is to determine whether the investigation "would have developed an independent, *legal* avenue for discovery of the evidence in question." *Id.* at ¶ 17 (emphasis added). In view of the Task Force's adoption of a plan that included an illegal entry from the outset, we cannot, with any confidence, conclude that an "independent, legal avenue for discovery" was *ever* available. *Id.* Nor does the evidence presented at trial support a conclusion that the evidence would have been uncovered through an independent legal avenue. The State adduced no evidence during the trial detailing the normal course of activities that occur after a controlled narcotics buy is complete. Furthermore, even assuming that the State is correct when it asserts that under normal circumstances the CI would have left the home and proffered the methamphetamine to the Task Force officers, nothing about this situation strikes this court as "normal." The CI spent the evening drinking, and at some point during the evening he consumed methamphetamine. When he arrived to prepare for the controlled buy, the Task Force officers quickly became aware that the CI was under the influence of alcohol, and determined that the proper remedy was to ply the CI with "several cups of coffee" and observe him to ensure he was competent. When the officers were satisfied, they wired the CI with a transmitter, told him to signal when the buy was complete, and sent him into Callahan's home. When the CI gave the signal, the Task Force officers, *as planned, and following their own procedures,* burst into Callahan's home and detained all of the occupants, including the CI. Under these circumstances, it is not possible to conclude that the evidence would have been discovered through "independent, legal avenue[s]." *Id.* Therefore, we conclude that the evidence from the CI's pocket is not admissible pursuant to the inevitable discovery doctrine.

## CONCLUSION

¶ 11 The trial court erred in justifying the Task Force officers' warrantless entry into Callahan's home under the doctrine of exigent circumstances. Consequently, the evidence discovered during the raid, including the drugs found in the CI's pocket, is not admissible under that doctrine. Nor does the record support admitting the evidence found on the CI under the doctrine of inevitable discovery. The Task Force's adoption of tactics that involve planned illegal entry should not be countenanced, and permitting the use of any evidence found during this situation "would provide no deterrent at all to future unlawful detentions, entries, or searches." *State v. Topanotes,* 2003 UT 30,- ¶ 19, 76 P.3d 1159. Accordingly, we reverse Callahan's conviction resulting from the trial court's denial of Callahan's motion to suppress, and remand to the trial court with instructions to suppress all of the evidence collected as a result of the Task Force's illegal entry into Callahan's home.

¶ 12 WE CONCUR: NORMAN H. JACKSON, Judge, and GREGORY K. ORME, Judge.