2015 UT App 207

## THE UTAH COURT OF APPEALS

LAYTON CITY,
Plaintiff and Appellant,
*v.*
CHELSE MARIE BRIERLEY,
Defendant and Appellee.

Opinion
No. 20140496-CA
Filed August 13, 2015

Second District Court, Layton Department
The Honorable David R. Hamilton
No. 135605273

Marlesse D. Jones and Gary R. Crane, Attorneys
for Appellant

Mark W. Brown and Russell S. Pietryga, Attorneys
for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
JAMES Z. DAVIS and STEPHEN L. ROTH concurred.

TOOMEY, Judge:

¶1     In this interlocutory appeal, Layton City appeals from the district court's grant of Defendant Chelse Marie Brierley's motion to suppress evidence obtained after the warrantless entry of her residence. Because we agree with the City that the inevitable discovery doctrine applies to the suppressed evidence in this case, we reverse and remand.

### BACKGROUND

¶2     On September 30, 2013, police officers received a report that a black Mercedes SUV, driven by a "blonde female," was

seen leaving the site of a hit-and-run accident.[1] Dispatch gave the officers the reported license plate number for the vehicle and a home address for its registered owner. Sergeant Andrew Joseph went to this address and saw a black SUV parked in the open garage. Another officer, Sergeant Roger James Dixon, arrived around the same time.

¶3     The officers saw a woman (Housekeeper) standing inside the garage. When the officers walked up the driveway, Housekeeper stepped out of the garage to greet them. Sergeant Joseph asked her whether she had been driving the vehicle, to which Housekeeper responded that she had not. When asked who had been driving the vehicle, Housekeeper responded that she thought Brierley, the homeowners' daughter, had been driving it.

¶4     During this conversation, Housekeeper expressed concern that the vehicle parked in the garage might be on fire. Both officers entered the garage to check on it. Sergeant Joseph smelled hot fluid and noticed that the vehicle was steaming and had front end damage. Housekeeper stated that while she was inside the house, she had heard a loud noise. When she walked toward the location of the noise, Housekeeper saw Brierley come into the house from the garage and go downstairs to her bedroom. Housekeeper stated that Brierley "looked like she was in a bad way." To clarify, Joseph asked whether Brierley appeared to be under the influence of alcohol or drugs, and Housekeeper answered, "Yes."

¶5     In the garage, Housekeeper invited the officers into the residence to speak with Brierley, but they declined because they

---

1. In reviewing a trial court's ruling on a motion to suppress, "we consider the facts in a light most favorable to the trial court's findings and recite them accordingly." *State v. Mitchell*, 2013 UT App 289, ¶ 2, 318 P.3d 238 (citations and internal quotation marks omitted).

did not "feel that [they] had enough to enter the residence at that time without any exigent circumstances." But Sergeant Joseph told Housekeeper they needed to speak with Brierley and Housekeeper went downstairs to see if she could coax Brierley to come upstairs to talk with the officers. Meanwhile, they called the Layton City Attorney for legal advice on how to make contact with Brierley. During this call, the officers and the City Attorney all agreed that they "needed a warrant to proceed into the house."

¶6     When Housekeeper returned upstairs, she heard the officers pounding on the front door. Housekeeper opened it and relayed that Brierley had asked her to tell them she was not at home. The officers asked Housekeeper for the phone number for Brierley's father so they could get permission to enter the residence. Housekeeper left the front door open while she went to find the phone number. Meanwhile, Sergeant Joseph went to retrieve his computer for the purpose of drafting a search warrant request.

¶7     Sergeant Dixon stepped through the open front door into the residence and informed Housekeeper the house was under lock down and no one was allowed to leave. Dixon told Housekeeper she could tell Brierley they were in the process of getting a search warrant that would allow them to look for her. In response, Housekeeper went downstairs to persuade Brierley to come speak with the officers. Sergeant Joseph arrived at the front door with his computer and, upon seeing Dixon inside, also entered the residence. Joseph placed his computer on a table in the entryway and began drafting the search warrant documents. As he was preparing these, Brierley, Housekeeper, and a male individual came up the stairs from the basement. At this point, Dixon asked Brierley to step outside to discuss the situation. Brierley nodded and they went to the garage, where Dixon questioned her. During the investigation, Dixon did a license check and obtained Brierley's date of birth and full name. He also obtained a statement from Brierley and conducted tests

to determine whether she was under the influence of alcohol including field sobriety tests[2] and a portable breath test. A different breath test was administered to Brierley at the police station, revealing a blood alcohol level of .143.

¶8 The City ultimately charged Brierley with driving under the influence of alcohol and/or drugs, violation of operator duties for accident involving property damage, and driving on denied operator's license, all misdemeanors. Before trial, Brierley moved to suppress the evidence resulting from the officers' warrantless entry into her home. The City opposed the motion, arguing that the mere presence of officers in a house while securing a warrant is not unlawful and that, in any event, the inevitable discovery doctrine applied to allow the admission of the evidence.[3]

¶9 After a suppression hearing and oral arguments on the motion, the district court rejected the City's arguments. It concluded that "[w]ithout probable cause *and* exigent circumstances, the police's warrantless search and seizure cannot be upheld on an officer's need to secure a home in preparation of obtaining a warrant." The court reasoned that application of the inevitable discovery doctrine was not justified in this case because "[w]hether Sergeant Joseph's warrant request *would* have actually been granted and whether the same evidence would have inevitably been discovered remains speculative." Consequently, the court granted Brierley's motion and suppressed all evidence obtained following the warrantless

---

2. The nature of these tests is not identified in the record.

3. The City also contended there was no evidence to be suppressed because no evidence discovered was in the residence where an unlawful entry was alleged to have occurred. The district court rejected this argument on the basis that the City did not provide any legal support.

entry into the house. The City filed a petition for interlocutory review, which we granted.

ISSUE AND STANDARDS OF REVIEW

¶10 The City argues the district court erred by granting Brierley's motion to suppress. We review the grant of a motion to suppress as a mixed question of law and fact. *State v. Worwood*, 2007 UT 47, ¶ 12, 164 P.3d 397. We review the district court's underlying factual findings for clear error and its legal conclusions for correctness. *Id.*

ANALYSIS

¶11 The City challenges the district court's grant of Brierley's motion to suppress the evidence obtained following the officers' warrantless entry into her residence. For purposes of our analysis, we assume without deciding that the officers' presence in Brierley's home was unlawful[4] and we proceed to analyze the City's alternative argument, namely, whether the inevitable discovery doctrine should be applied.

¶12 The City asserts that "based on the probable cause established for the search warrant that the officers were in the process of obtaining" when Brierley came upstairs, "the warrant would have been obtained, officers would have served it and detained [Brierley], and the evidence would have inevitably been discovered." In contrast, Brierley contends the challenged evidence would not have been obtained but for the warrantless entry into Brierley's home. For this reason, Brierley specifically

---

4. At oral argument, the City conceded there were no exigent circumstances justifying the officers' entry into the house, and asked us to assume arguendo that it was unlawful for the officers to be in the house.

asserts the "field sobriety tests, breath tests, statements made, [and] license checks" should be suppressed.

¶13    "Until a valid warrant has issued, citizens are entitled to shield 'their persons, houses, papers, and effects' . . . from the government's scrutiny." *Hudson v. Michigan*, 547 U.S. 586, 593 (2006) (quoting U.S. Const. amend. IV). "The exclusionary rule prohibits the use at trial of evidence . . . obtained in violation of an individual's constitutional and statutory rights." *State v. Topanotes*, 2003 UT 30, ¶ 13, 76 P.3d 1159. Moreover, it deters unlawful police behavior by "prevent[ing] the police from benefitting from their illegalities." *Id.* But these "harsh consequences" are "tempered somewhat by the exceptions to the exclusionary rule." *Id.* "The exceptions allow prosecutors to use the challenged evidence at trial when the 'taint' of illegality is sufficiently cleansed." *Id.*

¶14    One such exception is embodied in the inevitable discovery doctrine, which allows tainted evidence to be admitted at trial if it "*would have been discovered* by lawful means." *State v. Strieff*, 2015 UT 2, ¶ 24. This doctrine seeks to "put[] the police in the same . . . position . . . they would have been in if no police error or misconduct had occurred." *Nix v. Williams*, 467 U.S. 431, 443 (1984). The Utah Supreme Court has instructed that "'[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received.'" *Topanotes*, 2003 UT 30, ¶ 14 (omission in original) (quoting *Nix*, 467 U.S. at 444).[5]

---

5. The City also contends on appeal that another exception to the exclusionary rule, the attenuation doctrine, applies to allow the admission of the challenged evidence against Brierley. The City asserts that Brierley's independent act of voluntarily coming upstairs and engaging with the officers broke the causal

(continued…)

¶15   Utah appellate courts have addressed the application of the inevitable discovery doctrine on several occasions. *See, e.g.*, *State v. Tripp*, 2010 UT 9, ¶¶ 57–59, 227 P.3d 1251 (refusing to apply the inevitable discovery doctrine because the police lacked probable cause and the investigating officer "took no steps whatsoever to obtain" a search warrant); *State v. Worwood*, 2007 UT 47, ¶¶ 47–51, 164 P.3d 397 (ruling that the inevitable discovery doctrine was inapplicable because the "field sobriety tests would not have been obtained absent the illegality or different choices" by the investigating officer); *Topanotes*, 2003 UT 30, ¶¶ 19–21 (holding that evidence was not admissible under the inevitable discovery doctrine where the police performed a warrants check while illegally detaining the defendant); *State v. Mitchell*, 2013 UT App 289, ¶¶ 23–24, 318 P.3d 238 (affirming the trial court's admission of evidence under the inevitable discovery doctrine because "the valid search warrant was an independent basis for discovery that would have

---

(…continued)

chain between the officers' illegal entry and their discovery of incriminating evidence. The attenuation doctrine "is limited to circumstances . . . involving a defendant's independent acts of free will" and is "distinct" from the other exceptions to the exclusionary rule. *State v. Strieff*, 2015 UT 2, ¶¶ 25, 42. "[T]o preserve an issue for appeal[,] the issue must be presented in such a way that the trial court has an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (second alteration in original) (citation and internal quotation marks omitted). Here, the City asked the district court to apply only one exception to the exclusionary rule, explaining, "[W]e do hang our hat on inevitable discovery, that inevitably it would have happened had she not come up the stairs." Because we conclude the City did not present the attenuation doctrine in such a way that the district court had the opportunity to rule on the issue, the City has not preserved it for appeal and we do not further address it.

inevitably led to the computer evidence independent of the constitutional violation" (citation and internal quotation marks omitted)); *State v. Callahan*, 2004 UT App 164, ¶¶ 9–11, 93 P.3d 103 (reversing a conviction resulting from the trial court's denial of a motion to suppress because "[i]n view of the Task Force's adoption of a plan that included an illegal entry from the outset," this court could not conclude that "an independent, legal avenue for discovery was *ever* available" (citation and internal quotation marks omitted)). But these decisions do not address whether the doctrine applies where, as here, the police began efforts to obtain a search warrant before making an illegal entry or search and then abandoned the warrant process when circumstances changed.

¶16   The Tenth Circuit, however, has analyzed the applicability of the doctrine in a similar scenario. In *United States v. Souza*, 223 F.3d 1197 (10th Cir. 2000), it explained, "While the inevitable discovery doctrine does not apply in situations where the government's *only* argument is that it had probable cause for the search, [it] may apply where, in addition to the existence of probable cause, the police had taken steps in an attempt to obtain a search warrant." *Id.* at 1203 (emphasis added) (footnote omitted). To determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant," the Tenth Circuit identified four factors to aid in its analysis:

> [1] the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; [2] the strength of the showing of probable cause at the time the search occurred; [3] whether the warrant ultimately was obtained, albeit after the illegal entry; and [4] evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*Id.* at 1204 (citations and internal quotation marks omitted). "The more contingencies there are, and the lower the probability that each would have been resolved in the government's favor, the lower the probability that the evidence would have been found by lawful means." *Id.* at 1205. Thus, after evaluating these factors, "a court may apply the inevitable discovery exception only when it has a high level of confidence[6] that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." *Id.* Although we do not formally adopt this test, we find it useful to our analysis in this case.

¶17    Here, the officers took steps toward obtaining a search warrant, including contacting the City Attorney, deciding to apply for a warrant, and retrieving a computer to complete the required documents. This factor weighs in the City's favor.

¶18    The record demonstrates that the probable-cause showing was strong and a warrant in all likelihood would have been issued based on information known to the officers before they entered the house. In particular, the officers received reports of a blonde female driving a black Mercedes SUV away from the scene of a hit-and-run accident. They had the reported license

---

6. Unlike the Second and Tenth Circuits, which use a "high level of confidence" standard, some circuits require only a "reasonable probability" that the challenged evidence would have been discovered lawfully. *Compare, e.g.*, *United States v. Marrocco*, 578 F.3d 627, 639–40 & n.24 (7th Cir. 2009) (using an "intermediate standard" in concluding that the inevitable discovery rule applies where "investigating officers undoubtedly would have followed routine" to obtain evidence), *with United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006) (concluding that the inevitable discovery rule will be applicable only where the court can conclude "with a high level of confidence that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor").

plate number for the fleeing vehicle and, upon arriving at the home address for its registered owner, saw a black SUV parked in the open garage. When the officers talked to Housekeeper, who was standing next to the SUV, she told them Brierley had been driving the vehicle and that it might be on fire. When the officers checked on the vehicle, they saw that it was steaming and its front end was damaged. Moreover, Housekeeper also mentioned that Brierley went into the house and "looked like she was in a bad way," meaning she appeared to be under the influence of alcohol or drugs. Based on these facts, the officers had probable cause to believe Brierley had committed an offense. This factor weighs in the City's favor.

¶19 At this point, the officers intended to secure a search warrant and initiated the process, but Sergeant Joseph ultimately abandoned his efforts to obtain it because Brierley walked upstairs and met the officers, thus obviating the need for the warrant. This factor weighs against the City, but not strongly.

¶20 The testimony of the officers at the suppression hearing does not suggest that their entry into the house was motivated by a lack of confidence in their probable-cause showing or a desire to bypass the warrant requirement. Rather, they seemed willing to wait for the warrant to talk to Brierley. In addition, the fact that Sergeant Joseph continued drafting the search warrant application while standing inside the Brierley residence lends support to the conclusion that the officers did not intend to force the issue by entering it in the first place.

¶21 Taking these factors together, we conclude the City met its burden to show by a preponderance that the evidence would have been discovered by lawful means. The police had a strong showing of probable cause to search the house for Brierley: witness descriptions of the vehicle and driver involved in the collision, including a license plate number that brought them to Brierley's house; a damaged, steaming vehicle matching the witness descriptions parked in Brierley's open garage; Housekeeper's statements that she thought Brierley had been

driving the car, had seen her exit the garage, and thought she appeared to be under the influence of alcohol or drugs. They had taken steps to seek a warrant, including contacting the City Attorney and beginning to draft the necessary documents. As a consequence, we have a high level of confidence that a search warrant would have been issued, in which case they would have searched the house, found Brierley in it, and proceeded with questioning, field sobriety tests, breath tests, and license checks.[7] Moreover, because this evidence would have been inevitably discovered, "'the deterrence rationale has so little basis that the evidence should be received.'" *See State v. Topanotes*, 2003 UT 30, ¶ 14, 76 P.3d 1159 (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). We therefore determine that the district court erred in refusing to apply the inevitable discovery doctrine to allow the admission of evidence regarding the field sobriety tests, the breath tests, Brierley's statements,[8] and the license check.

---

7. Brierley argues the inevitable discovery doctrine is inapplicable because "there was no independent investigation that would lead to the discovery of evidence separate from the [warrantless entry]." But the inevitable discovery doctrine requires "an independent basis for discovery," not "an entirely independent, alternate, intervening, appreciably attenuated investigation aside from the tainted investigation." *State v. Topanotes*, 2003 UT 30, ¶¶ 15–16, 76 P.3d 1159 (citations and internal quotation marks omitted).

8. Although the parties do not describe the statements Brierley is alleged to have made, our own review of the record has illuminated only one statement: Sergeant Joseph averred in a probable cause affidavit that "[u]pon contact Brierley denied driving the vehicle saying the driver was a male adult in his sixties." We note that this statement does not resemble a confession and constitutes only a small piece of the City's case against Brierley.

¶22    Although we do not condone the officers' entry into Brierley's house before they had obtained a search warrant, we do not believe their presence on the inside of the threshold, rather than several feet away on the outside of the threshold, made a material difference. They had locked down the house—meaning that no one could leave—started the process of obtaining a search warrant to look for Brierley, and were prepared to wait for it. Once they had a warrant, they would have located Brierley and the rest of their evidence gathering would have ensued. Brierley's emergence from her bedroom while the officers were still in the process of seeking the search warrant merely hastened this inevitable process, and we think it highly unlikely that their presence on one side of the threshold or the other had an effect on this sequence of events.

## CONCLUSION

¶23    We conclude that the field sobriety tests, the breath tests, Brierley's statements, and the information from checking Brierley's license would have been discovered by lawful means. Consequently, the inevitable discovery doctrine should apply to permit the City to offer this evidence notwithstanding the officers' warrantless entry to Brierley's house. We therefore reverse the order suppressing the evidence and remand for further proceedings.

———————