*This opinion is subject to revision before final publication in the Pacific Reporter*

**2016 UT 46**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

CHELSE MARIE BRIERLEY,
*Petitioner,*

*v.*

LAYTON CITY,
*Respondent.*

No. 20150760
Filed October 21, 2016

On Certiorari from the Court of Appeals

Second District, Layton
The Honorable David R. Hamilton
No. 135605273

Attorneys:

Russell S. Pietryga, Mark W. Brown, Salt Lake City, for petitioner

Gary R. Crane, Marlesse D. Jones, Layton, for respondent

JUSTICE PEARCE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM, and JUSTICE HIMONAS joined.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 Two Layton City police officers investigating a hit-and-run accident entered a private residence with neither permission nor a warrant. While there, they discovered evidence linking Chelse Marie Brierley to the accident. Brierley moved to suppress that evidence, arguing Layton City (City) had obtained it in violation of her Fourth Amendment rights. The City argued that the officers were in the process of obtaining a search warrant at the time they entered the house and that the evidence should therefore be admitted under the inevitable-discovery exception to the exclusionary rule. The district court granted Brierley's suppression motion, concluding that the

City had failed to demonstrate that it would have inevitably discovered the challenged evidence by lawful means.

¶2 The City sought interlocutory review by the Utah Court of Appeals, which reversed the district court's ruling. *See Layton City v. Brierley*, 2015 UT App 207, 357 P.3d 1018, *cert. granted*, 363 P.3d 523 (Utah 2015). The court of appeals evaluated the City's inevitable-discovery argument using four factors enunciated in *United States v. Souza*, 223 F.3d 1197 (10th Cir. 2000). The court of appeals held that the officers would have inevitably discovered the evidence resulting from the warrantless search if they had obtained a lawful warrant and reversed the district court's suppression order. *Brierley*, 2015 UT App 207, ¶ 23.

¶3 We granted Brierley's petition for a writ of certiorari. We conclude that the City failed to meet its burden of proving that we should apply the inevitable-discovery exception in this case. We reverse the decision of the court of appeals, affirm the district court's order granting Brierley's suppression motion, and remand for further proceedings.

## BACKGROUND[1]

¶4 On September 30, 2013, two City police officers received a report of a hit-and-run accident. Dispatch informed the officers that a blonde woman driving a black SUV had been spotted leaving the scene of the accident. Dispatch provided the officers with the SUV's license plate number and the home address of the registered owner.

¶5 When Sergeants Joseph and Dixon arrived at the address, they saw a black SUV parked in an open garage and a blonde woman standing nearby. As the officers approached the garage, the woman stepped out to greet them. In response to questions, the woman identified herself as the housekeeper, denied that she had been driving the SUV, and told the officers that she thought that the homeowner's daughter—Brierley—had pulled the car into the garage.

¶6 The housekeeper also told the officers that she was afraid the SUV might be on fire. At least one officer, Joseph, accompanied the housekeeper into the garage to check on the vehicle. Joseph smelled

---

[1] We take the background facts primarily from the district court's factual findings, which are not challenged on appeal.

steam coming from the vehicle and saw that the front end was damaged, but he concluded that there was no danger of combustion.

¶7 The officers further questioned the housekeeper, who related that she had been inside the house when she heard a loud noise. As she went to investigate, she saw Brierley come into the house through the garage and go downstairs toward her bedroom. The housekeeper told the officers that Brierley "looked like she was in a bad way." The housekeeper clarified that Brierley looked to be under the influence of alcohol or drugs.

¶8 The housekeeper invited the officers to come inside the house to speak with Brierley. The officers declined because, according to Dixon's testimony, they did not "feel that [they] had enough to actually enter the residence at that time without any exigent circumstances." Joseph told the housekeeper that he needed to speak with Brierley. The housekeeper went downstairs to see if she could get Brierley to speak with the officers.

¶9 While the housekeeper was downstairs, Joseph entered the backyard and banged on a window in an unsuccessful attempt to make contact with Brierley. The officers then decided that they needed legal advice on how to proceed. Dixon called a Layton City Attorney and, apparently based on that conversation, the officers decided that they needed to obtain a warrant.

¶10 The housekeeper testified that she returned from the basement to the sound of the officers pounding on the front door. She opened the door and told the officers that Brierley had told her to tell them that Brierley was not at home. The officers then asked the housekeeper if she could give them Brierley's father's phone number so they could seek his permission to enter the home. The housekeeper returned into the house to get the number and left the front door open.

¶11 Dixon stepped through the open door and announced to the housekeeper that no one would be allowed to leave. Dixon told the housekeeper that she was welcome to let Brierley know that the officers were in the process of obtaining a search warrant. The housekeeper returned downstairs to speak with Brierley. Dixon stayed inside.

¶12 While Dixon was speaking with the housekeeper, Joseph walked to his motorcycle to retrieve his tablet to draft a search warrant request. When Joseph returned to the front door, he saw that Dixon had moved inside. Joseph joined Dixon in Brierley's home. Once inside, Joseph placed his tablet on a table and began

drafting a warrant request.[2] While Joseph was typing the search warrant application, Brierley came upstairs with the housekeeper. Dixon asked Brierley to step outside to discuss the situation, and the two went to the garage. While in the garage, Dixon obtained evidence from Brierley, including incriminating statements, the results of a blood-alcohol test, and information retrieved from a driver license check.

¶13 The City charged Brierley with driving under the influence, driving on a denied license, and leaving the scene of a property-damage accident. Brierley moved to suppress all evidence discovered after the officers entered the house, arguing that the warrantless entry violated her Fourth Amendment rights. The City argued that the inevitable-discovery exception to the exclusionary rule applied because the officers were in the process of obtaining a warrant when they entered the house.

¶14 The district court concluded that the inevitable-discovery exception, which allows for the admission of illegally obtained evidence if it would have inevitably been discovered absent the police misconduct, did not apply in this case. The district court ruled,

> Whether Sergeant Joseph's warrant request *would* have actually been granted and whether the same evidence would have inevitably been discovered remains [too] speculative to justify application of the inevitable discovery doctrine. This Court concludes that to apply the inevitable discovery doctrine under the facts of this case would significantly weaken Fourth Amendment protections.

The district court also noted that application of the exception would provide "no deterrent at all" to future warrantless entries. The district court granted Brierley's motion, ordering that "all evidence obtained in this matter following the warrantless entry into [Brierley's] home" be suppressed.

¶15 The City sought interlocutory review of the district court's suppression order. The court of appeals granted the City's petition. *See Layton City v. Brierley*, 2015 UT App 207, ¶ 9, 357 P.3d 1018. On

---

[2] The record does not reflect why the officers decided that they should work on their warrant application inside the home.

review, the court of appeals concluded that the City had established the applicability of the inevitable-discovery exception to the warrantless search. *Id.* ¶¶ 17–18. The court of appeals evaluated the exception using four factors the Tenth Circuit Court of Appeals enumerated in *United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000). These factors examined (1) the steps the officers had taken toward getting a warrant before entering; (2) the strength of the probable cause showing; (3) whether officers eventually obtained a warrant, albeit after the entry; and (4) whether officers "jumped the gun" in an attempt to overcome a lack of probable cause. *Brierley*, 2015 UT App 207, ¶ 16 (citing *Souza*, 223 F.3d at 1204).

¶16 The court of appeals concluded that the first two factors weighed in favor of the City; that the third factor weighed "against the City, but not strongly"; and that testimony of the officers suggested the fourth factor weighed in favor of the City. *Id.* ¶¶ 17–20. "Taking these factors together," the court of appeals concluded that "the City met its burden to show by a preponderance that the evidence would have been discovered by lawful means." *Id.* ¶ 21. Accordingly, the court of appeals reversed the district court's suppression order and remanded for further proceedings. *Id.* ¶ 23.

¶17 We granted Brierley's petition for a writ of certiorari. We reverse.

**STANDARD OF REVIEW**

¶18 On certiorari, we review the decision of the court of appeals, not that of the district court, and we afford no deference to the court of appeals' decision. *See State v. Strieff*, 2015 UT 2, ¶ 12, 357 P.3d 532, *rev'd on other grounds*, 136 S.Ct. 2056 (2016). "The correctness of the court of appeals' decision turns on whether that court accurately reviewed the trial court's decision under the appropriate standard of review." *State v. Tripp*, 2010 UT 9, ¶ 23, 227 P.3d 1251 (citation omitted). "A trial court's ruling on a motion to suppress is reviewed for correctness, including its application of the law to the facts." *Id.* We review for correctness because the application of the exclusionary rule presents a "law-like" mixed question that lends itself to "consistent resolution by a uniform body of appellate precedent." *Strieff*, 2015 UT 2, ¶ 13 (citation omitted).

**ANALYSIS**

¶19 The Fourth Amendment to the United States Constitution prohibits unreasonable searches of both persons and property. *See* U.S. CONST. amend. IV; *State v. Roberts*, 2015 UT 24, ¶ 24, 345 P.3d 1226. "[P]hysical entry [into] the home is the chief evil against which

the wording of the Fourth Amendment is directed."[3] *State v. Duran*, 2007 UT 23, ¶ 6, 156 P.3d 795 (quoting *United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972)). "Accordingly, 'searches and seizures inside a home without a warrant are presumptively unreasonable,' even when officers have probable cause to search." *Id.* (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).

¶20 Courts have breathed life into the Fourth Amendment's protections by developing the exclusionary rule, which generally requires suppression of evidence obtained in violation of constitutional protections. *See Mapp v. Ohio*, 367 U.S. 643, 654–55 (1961). Nevertheless, evidence discovered as a result of an illegal search or seizure may sometimes be admitted under various exceptions to the exclusionary rule. "Three of these exceptions [examine] the causal relationship between the unconstitutional act and the discovery of evidence." *Utah v. Strieff*, 136 S.Ct. 2056, 2061 (2016). These "three closely related but analytically distinct exceptions" are (1) the independent-source exception, (2) the inevitable-discovery exception, and (3) the attenuation exception. *United States v. Terzado-Madruga*, 897 F.2d 1099, 1113 (11th Cir. 1990). Brierley's case involves the inevitable-discovery exception, which permits the admission of evidence that would have inevitably been lawfully discovered notwithstanding its actual discovery as the result of an unconstitutional search or seizure. *See State v. Topanotes*, 2003 UT 30, ¶ 14, 76 P.3d 1159.[4]

---

[3] This respect for the home predates our federal constitution and hearkens back to our English common-law roots. In the words of William Pitt the Elder,

> The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail, its roof may shake; the wind may blow through it; the storms may enter, the rain may enter,—but the King of England cannot enter; all his forces dare not cross the threshold of the ruined tenement.

William Pitt, the Elder, Earl of Chatham, Speech in the House of Lords (1763).

[4] It bears emphasizing that the parties have argued only about inevitable discovery. We are not asked to opine on whether any other exception might apply.

¶21 The United States Supreme Court formally recognized the inevitable-discovery exception in *Nix v. Williams*, 467 U.S. 431 (1984). In *Nix*, a police detective questioned the defendant in violation of his right to counsel. In response to the questioning, the defendant led police to the body of his deceased victim. *Id.* at 435–36. Despite the constitutional violation, the Court concluded that evidence regarding the body should not be suppressed because at the time of the illegal questioning "search parties were approaching the actual location of the body" and would have inevitably located it without reliance on the defendant's statements. *Id.* at 448–50. The Court held that when "the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." *Id.* at 448.

¶22 The Supreme Court reasoned that the competing public interests of "deterring unlawful police conduct and . . . having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, *not a worse*, position [than] they would have been in if no police error or misconduct had occurred." *Id.* at 443 (emphasis added). When evidence would have inevitably been discovered regardless of any police misconduct, it follows that the "police would have obtained that evidence if no misconduct had taken place." *Id.* at 444. The inevitable-discovery exception is therefore necessary to "ensure[] that the prosecution is not put in a worse position simply because of some earlier police error or misconduct." *Id.* at 443.

¶23 Since *Nix*, this court has analyzed the inevitable-discovery exception on a handful of occasions, finding in each instance that the State had not demonstrated that the evidence would have inevitably been discovered. In *State v. Topanotes*, 2003 UT 30, 76 P.3d 1159, we concluded that the exception did not apply where an officer illegally detained a woman, conducted a warrants check on her during the illegal detention, and then arrested and searched her after the check revealed an outstanding arrest warrant. *See id.* ¶¶ 19–21. In *State v. Worwood*, we rejected the State's argument that an officer would have conducted field sobriety tests at the scene of his initial encounter with a suspected drunk driver if the officer had not instead chosen to illegally transport the suspect to the officer's nearby house to administer the tests. 2007 UT 47, ¶¶ 5, 48–49, 164 P.3d 397. And in *State v. Tripp*, we affirmed a court of appeals ruling that a warrantless blood draw was inadmissible despite the State's argument that had the officer not acted without a warrant, he

inevitably "would have taken the necessary steps to secure a warrant." 2010 UT 9, ¶ 59, 227 P.3d 1251.

¶24 Our cases involving the inevitable-discovery exception have developed some guidelines for its application. We have rejected the proposition that the exception "can be satisfied *only* by an 'entirely independent, alternate, intervening, appreciably attenuated investigation aside from the tainted investigation.'" *State v. James*, 2000 UT 80, ¶ 15, 13 P.3d 576 (emphasis added) (citation omitted). However, independence remains a "crucial element" of the exception. *Topanotes*, 2003 UT 30, ¶ 16. While there must not necessarily be an entirely independent investigation, "there must be some 'independent basis for discovery,'" *id.* (alteration in original) (quoting *United States v. Boatwright*, 822 F.2d 862, 865 (9th Cir. 1987)), and "the investigation that inevitably would have led to the evidence [must] be independent of the constitutional violation," *id.* (quoting *United States v. Larsen*, 127 F.3d 984, 987 (10th Cir. 1997)). Furthermore, "the fact or likelihood that makes the discovery inevitable [must] arise from circumstances other than those disclosed by the illegal search itself." *Topanotes*, 2003 UT 30, ¶16 (alteration in original) (quoting *Boatwright*, 822 F.2d at 864–65).

¶25 In addition, we have declined to adopt a formal test "to elaborate upon or elucidate the *Nix* standard, by adopting more specific requirements." *James*, 2000 UT 80, ¶ 16. Thus, "the appropriate standard governing the inevitable discovery exception" remains what *Nix* enunciated: "whether 'the prosecution can establish by a preponderance of the evidence that the information ultimately would have been discovered by lawful means.'" *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)); *see also State v. Tripp*, 2010 UT 9, ¶ 56, 227 P.3d 1251 ("The inevitable discovery doctrine admits unlawfully obtained evidence if the police would have, in spite of the illegality, discovered the evidence by some other legal means.").

¶26 The City argues that evidence discovered after the warrantless entry into Brierley's home falls within the inevitable-discovery exception because the officers would have obtained the same evidence had they obtained a warrant. The possibility that a police officer would have obtained a warrant if he had not chosen to act without one is quite different than the circumstances—an ongoing, independent search—that led the United States Supreme Court to adopt the inevitable-discovery exception in *Nix*. In fact, this court has characterized arguments similar to the City's as "[i]f we hadn't done it wrong, we would have done it right." *Topanotes*, 2003

UT 30, ¶ 19 (alteration in original) (quoting *United States v. Thomas*, 955 F.2d 207, 210 (4th Cir. 1992)); *see also Tripp*, 2010 UT 9, ¶ 59. Such arguments, we have observed, are "far from compelling." *Topanotes*, 2003 UT 30, ¶ 19.

¶27 Other courts have, nevertheless, extended the inevitable–discovery exception to situations where government agents have acted without a warrant but the government argues that officers would have procured such a warrant absent the police illegality. In some instances, courts have found that such a showing can satisfy the inevitable-discovery exception. *See, e.g.*, *United States v. Souza*, 223 F.3d 1197, 1206 (10th Cir. 2000) (applying the exception after concluding that "but for [one agent] opening the package, [a different agent] would have obtained a warrant and the evidence would have been discovered"). In other instances, courts have viewed such arguments skeptically. *See, e.g.*, *United States v. Griffin*, 502 F.2d 959, 961 (6th Cir. 1974) (per curiam) ("[P]olice who believe they have probable cause to search cannot enter a home without a warrant merely because they plan subsequently to get one. . . . Any other view would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment.").

¶28 The disparate results reflect the tension between two competing—and compelling—policies. The inevitable-discovery exception promotes the "interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime." *Nix v. Williams*, 467 U.S. 431, 443 (1984); *supra*, ¶ 22. The United States Supreme Court has opined that these policies are properly balanced when the police are placed "in the same, not a worse, position [than] they would have been in if no police error or misconduct had occurred." *Id*. But it becomes difficult to strike the precise balance in cases where the police have probable cause to seek a warrant but act without one. In that class of cases, a rule that would "excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment." *United States v. Echegoyen*, 799 F.2d 1271, 1280 n.7 (9th Cir. 1986).

¶29 Courts have responded to this tension by attempting to ensure that the exception is available only when the government can forward evidence that the police actually *would* have lawfully discovered the same evidence had they obtained a warrant, not just that they had probable cause to obtain the warrant. *See, e.g.*, *Souza*, 223 F.3d at 1204 ("The key issue in these cases, one of probability, is

how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant.").

¶30 Here, the court of appeals followed this approach and viewed the case in light of the four factors *Souza* discussed. *Souza* evaluated inevitability by examining

> [1] the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; [2] the strength of the showing of probable cause at the time the search occurred; [3] whether the warrant ultimately was obtained, albeit after the illegal entry; and [4] evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*Layton City v. Brierley*, 2015 UT App 207, ¶ 16, 357 P.3d 1018 (alterations in original) (quoting *Souza*, 223 F.3d at 1204). The court of appeals concluded that, "[t]aking these factors together," the City had established inevitability by a preponderance of the evidence. *Id.* ¶ 21.

¶31 We decline to adopt the *Souza* factors as a test to evaluate claims that police would have inevitably discovered evidence by lawfully obtaining a warrant.[5] Instead, we resort to *Nix*'s

---

[5] We acknowledge that the court of appeals expressly stated that it was not adopting *Souza* as a formal test. *See Layton City v. Brierley*, 2015 UT App 207, ¶ 16, 357 P.3d 1018 ("Although we do not formally adopt this test, we find it useful to our analysis in this case."). However, we know that in practice, identified factors have a way of evolving into formal tests through their repeated application. *See, e.g., State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841 (explaining that the probative value of evidence must be balanced against its prejudicial effect under rule 403 of the Utah Rules of Evidence and not merely under "the limited list of considerations outlined in [*State v.*] *Shickles*," 760 P.2d 291 (Utah 1988)). As a hedge against that result, we expressly disclaim the use of the *Souza* factors as a test. We consider this caution particularly necessary in this instance as the *Souza* factors, if they are weighed and balanced against each other, possess the potential to allow a strong showing of probable cause to swallow the other factors and distract a reviewing court from

(continued . . .)

requirement that the prosecution "establish by a preponderance of the evidence that the information ultimately would have been discovered by lawful means." *State v. James*, 2000 UT 80, ¶ 16, 13 P.3d 576 (quoting *Nix*, 467 U.S. at 444). In this case, then, the City must show that Joseph and Dixon would have sought and obtained a warrant and that the same evidence would have been discovered after receiving that warrant. Evaluating the City's inevitable-discovery argument under the appropriate *Nix* standard, we reverse the decision of the court of appeals. We agree with the district court that the City's arguments rely too heavily on speculation.

¶32 Here, the City argued that if the officers had not entered the house, a warrant would have issued and the officers would have conducted a legal search. To succeed on this particular theory, the City first needed to demonstrate that the police would have sought and obtained a warrant.[6] Parties have, at times, prevailed on this theory. For example, in *United States v. Christy*, an FBI agent had developed probable cause that the defendant was involved in the disappearance and sexual abuse of a sixteen-year-old girl. 739 F.3d 534, 537–38 (10th Cir. 2014). Before the agent could obtain a warrant to search the defendant's residence, two sheriff's deputies sent to

---

focusing on the probability that officers would actually have uncovered the same evidence legally.

[6] At least one jurisdiction has adopted a bright-line rule requiring the prosecution to demonstrate that officers have taken concrete steps to obtain a warrant before it will apply the inevitable-discovery exception. *See Rodriguez v. State*, 187 So. 3d 841, 849 (Fla. 2015) ("We conclude that permitting warrantless searches without the prosecution demonstrating that the police were in pursuit of a warrant is not a proper application of the inevitable discovery rule."). We decline to adopt such a bright-line rule because we can envision instances where the state might demonstrate that evidence would have been lawfully discovered without a warrant. For example, some courts have concluded that evidence would have been discovered by lawful means when the government proved that a routine inventory search would have uncovered the evidence. *See, e.g. United States v. Johnson*, 777 F.3d 1270, 1277 (11th Cir. 2015); *United States v. Pritchett*, 749 F.3d 417, 437 (6th Cir. 2014). But because the City argues only that officers would have inevitably entered Brierley's home with a warrant, we confine our analysis to whether the City proved that contention.

check on the residence entered it without a warrant. *Id.* at 538. The reviewing appellate court concluded that the investigating officer "would have successfully obtained a warrant independent of the illegal search [by two other deputies]." *Id.* at 543. Similarly, in *Souza,* one agent was in the process of getting a warrant to search a package when another agent opened the seized package. *United States v. Souza*, 223 F.3d 1197, 1205–06 (10th Cir. 2000). The court concluded that "but for [one agent] opening the package, [a different agent] would have obtained a warrant and the evidence would have been discovered." *Id.* at 1206.

¶33  Unlike the prosecutors in *Christy* and *Souza,* the City did not argue that an officer other than those who violated the Fourth Amendment would have obtained a warrant. Instead, the City attempted to meet its burden with evidence that Joseph and Dixon intended to obtain a warrant to enter the Brierley residence and had taken significant steps toward that end. The City argued that, despite having reason to believe that the driver in the hit-and-run accident was inside the home, the officers declined to enter when the housekeeper initially invited them in because they recognized their obligation to procure a warrant before entering the home. They contacted a city attorney to discuss the situation. After that conversation, one of the officers retrieved his tablet from his motorcycle to fill out a warrant application. The City contends this demonstrates that the officers would have eventually obtained a warrant had they not entered the home illegally.

¶34 We disagree. If, while the officers were outside the home, some third officer had appeared on the scene and burst into the home without a warrant, we could hypothesize that absent the third officer's actions, Joseph and Dixon would have stayed outside while they completed and submitted their warrant application. But there was no third officer or anything else that could allow a court to conclude that the officers would have done anything differently than what they actually did. The City cannot meet its burden by speculating about what Joseph and Dixon might have done if they had not entered the home without a warrant because we know what they actually did. When presented with the question of whether they should wait to get a warrant before entering the home, they walked in without a warrant.

¶35 "For courts confidently to predict what would have occurred, but did not actually occur, there must be persuasive evidence of events or circumstances apart from those resulting in illegal police activity that would have inevitably led to discovery."

*State v. Topanotes*, 2003 UT 30, ¶ 16, 76 P.3d 1159. Although we have not required parties advocating inevitable discovery to point to a wholly separate investigation, we do require that they forward evidence sufficient to support a conclusion that but for the illegal search something different would have happened and that the "something different" would have inevitably resulted in the discovery of the same evidence by lawful means. Here, the City presented no evidence of *any* other investigation, *any* routine procedure, or *any* other officers working on the matter. The City is left to argue that Joseph and Dixon would have obtained the warrant before entering if they had not done the exact opposite. In other words, the "something different" the City offers consists entirely of the discredited argument that the officers "would have done it right" if they "hadn't done it wrong." *See id.* ¶ 19 (citation omitted); *see also State v. Tripp*, 2010 UT 9, ¶ 59, 227 P.3d 1251 (affirming the court of appeals' conclusion that blood draw evidence was not saved by the inevitable-discovery exception where police had "threatened to seek a warrant, [but] took no steps whatsoever to obtain one").

¶36 Although the City's inevitable-discovery argument fails solely because the City cannot show that the officers would have sought and obtained a warrant, we are also not convinced a warrant would have ultimately revealed all of the same evidence the officers uncovered as a result of the warrantless entry. *Nix* requires a showing that the evidence subject to the suppression motion "would have been discovered by lawful means"—in this case, the hypothetical warrant. 467 U.S. at 444. As a practical matter, this requires an examination of the nature of the evidence and the likelihood that it would still be discovered after a warrant could be lawfully procured.

¶37 When police have lawfully secured an inanimate object, such as a package, we can in most instances conclude with some certainty that its contents would not have changed in the time it would have taken police to obtain a warrant. *See, e.g.*, *Souza*, 223 F.3d at 1206 ("[T]he package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued."). When the evidence has not been secured and faces the possibility of human tampering, or any other mechanism of change, we may be less certain that the evidence would not have changed in the time it would have taken to secure a warrant.

¶38 And when the evidence turns on an individual's reaction to an illegal search, we can be even less certain that the police would have obtained identical evidence after obtaining a warrant. As we

recognized in *Topanotes*, "[c]ases that rely upon individual behavior as a crucial link in the inevitable-discovery chain, particularly when that behavior is heavily influenced by the illegality that did occur, rarely sustain an inevitable discovery theory." 2003 UT 30, ¶ 20. In *Topanotes,* we found "the assumption that Topanotes would have waited for the police to check for warrants and arrest her with heroin in her possession even if she had not been unlawfully detained" to be "most unrealistic." *Id.* Other courts have made similar observations. For example, the Third Circuit Court of Appeals has noted,

> While we know of no articulation of the inevitable discovery doctrine that restricts its application to physical evidence, and we are not prepared in this case to enunciate such a condition, it is patent why cases have generally, if not always, been so limited. A tangible object is hard evidence, and absent its removal will remain where left until discovered. In contrast, a statement not yet made is, by its very nature, evanescent and ephemeral. Should the conditions under which it was made change, even but a little, there could be no assurance the statement would be the same.

*United States v. Vasquez De Reyes,* 149 F.3d 192, 195–96 (3d Cir. 1998).

¶39 The City has offered nothing more than a bare assertion that Brierley's testimony and blood-alcohol test would have been the same had they awaited a warrant. We cannot say with confidence that Brierley's actions were not influenced by her knowledge that police had entered her home. Nor can we say that her actions and reactions would have been the same had the officers taken the time to obtain a warrant. But we can say with confidence that the City has not met its burden of demonstrating that the evidence would have been the same had the officers waited for a warrant.

¶40 The City has not established that the evidence against Brierley would have inevitably been discovered had the officers obtained a warrant because it has not established that the officers would have sought and obtained a warrant absent the unlawful entry and that such a warrant would have revealed the same evidence against Brierley. Therefore, we reverse the court of appeals' ruling and reinstate the district court's order suppressing the evidence.

**CONCLUSION**

¶41  The prosecution, in some instances, can meet the burden of establishing the inevitable-discovery exception by demonstrating that officers would have sought and obtained a warrant. Here, the record supports the district court's determination that the City's evidence was too speculative to establish inevitable discovery, and the court of appeals erred by concluding that the exception applies. We therefore reverse the court of appeals, reinstate the district court's suppression order, and remand this matter for further proceedings.

———————